May it please the Court, Scott Hunt, appearing on behalf of Debra Wood. On this second appeal of the case, there is essentially one issue before the Court regarding the age discrimination and retaliation claims, and that is whether the District Court erred in ruling that plaintiff did not raise the question of material fact as to whether or not she was considered to be under age discrimination. And that is in the context of a finding that there had been a discriminatory and retaliatory demotion within five months of her resignation. In terms of this Court's precedent, the question is whether, considering the totality of the circumstances, as opposed to a divide-and-conquer approach, is there evidence that the plaintiff did not raise the question of material fact as to whether or not she was considered to be under age discrimination and retaliation claims, and that is essentially one issue before the Court regarding the case. There is no evidence such that a reasonable jury could find that a reasonable person in plaintiff's position would have felt forced to quit because of intolerable and discriminatory work conditions. Counsel, let me ask you a question, and maybe you can make sure that I understand this record properly, because you've suggested she was demoted. Yes. My understanding from the record is that the position to which she was placed, I don't want to use the word transferred because I had made up my mind as to whether it was simply a transfer, a lateral transfer, or a demotion, but the position to which she was placed was at the same salary, with the same commission structure, and that in fact she actually made more money, by not a lot, but by some, than she had made the previous year. Am I correct or incorrect in that? You're correct, although the bonus structure wasn't exactly the same, it was no longer based on other people's performance, it was based solely on her own, but yes, it resulted in a small bonus. So what you call a demotion actually resulted in her making more money? Correct. And it's not what I call a demotion, it's what the general manager testified would be considered a demotion. I'm just speaking about what you're calling it today, you're referring to it as a demotion, and she actually made more money. Now I'm not saying that somebody couldn't be demoted and make more money, I mean, if you're a fabulous car salesman and you get a, and you had been the general manager, and you're such a fabulous car salesman that you get demoted to car salesman and you end up making more money than the general manager. It's still a demotion, but in this case she in fact ended up financially better off, right? Financially, yes, you've had the facts right, and your analogy is a good one. She went from being the general manager, the director of sales, with primarily management responsibilities, to being a salesperson, primarily doing sales, not a step up in one's career, but a step down. And yes, you're right, in that particular case, she made more money. But the district court found that there was a question of fact as to whether that demotion was discriminatory or retaliatory, and then chose to rule that that would not be considered as part of the constructive discharge because it was five months prior to her resignation. For purposes of summary judgment, it is a demotion, it's a change, it's a lesser time, it's a change, it's a demotion. It has no title, it's a less desirable position, it has no management responsibilities, it's purely a sales responsibility. Testimony from others in the industry is that it would be considered a demotion. So the question is, given that demotion, the question of fact as to whether it's discriminatory or retaliatory, is there sufficient facts to hold that this is a constructive discharge? And I think there are three key factors to consider in this, all right? And this is based on looking at the precedent cited throughout the brief. If we go to Schoenindig, which establishes that standard of intolerable circumstances to the reasonable person in her position, that court noted four factors that were not present in an age discrimination case, looking at the six factors listed by the plaintiff, it affirmed no constructive discharge and noted, this Court noted four missing factors. What were those four missing factors? Kagan. The case you're referring to? I'm sorry? The case name. Schoenindig, and I'm mispronouncing it, I'm sure, V. Columbia Machine, Inc., S-C-H-N-I-D-R-I-G. It's at our opening brief at 46. It listed six factors that weren't sufficient, but noticed four factors that were absent in that case. What were the four missing factors? Demotion, no pay cut, separate factors. Discouraged, not discouraged to resign, and not disciplined. In this case, we have three of those four factors that were missing. We have a demotion for purposes of summary judgment. We have her encouraged to resign, and we have her disciplined. Where was she disciplined? She was disciplined in the June meeting where she meets with Mr. Gross. I refer to it in the briefing as the handwriting on the wall meeting. In that meeting, according to her affidavit testimony, he points out that maybe it would be a good thing for her to leave if he encouraged her to resign and offered the possibility of a financial arrangement were she to do so. Was that the meeting where he said he'd heard that she was talking to people on the outside and saying she was very unhappy? Is that the meeting I'm thinking of? That's the meeting. So they had a breakfast meeting or something like that? I don't believe it was breakfast, but it's outside the premises. Some kind of an eating meeting. Yes. Okay. It's conducted in a – there's a couple factors here. It's disciplinary for purposes of summary judgment because he himself in his own memo of describing the meeting refers to it as his third warning meeting regarding her attitude. It's conducted in a manner that's similar to a termination meeting in that he brings Ms. Reyes as a witness. So it's disciplinary in nature, and in that meeting he encourages the plaintiff to resign by offering her a financial arrangement. He goes – in her testimony she talks about him demanding she resigned without using those exact words. Excuse me, counsel. Is this the meeting where she asks, are you asking for my resignation? And she describes his reaction as surprised? No, she doesn't react – I don't believe she – it is the meeting in which she asks, are you firing me? He said he indicated he wasn't. Right. And then proceeded to not once but three times say, but if you're not happy here that's not good for the company and it's not good for you. And he doesn't say it once, he says it three times, having just been told she's happy. Of course that's true, isn't it? I'm sorry? Of course that's true, isn't it? That's true under the record. I'm sorry, it's true. It's true cosmically. If you're so unhappy you're going outside the company and bad-mouthing the company and other people, that ain't good for you or the company, true? It indicates it's certainly not good for the company and it certainly indicates that she's not in a good place. I don't know that it indicates it's bad for her. Well, if somebody were working for me and that person was going out in the open market, so to speak, and saying what a lousy turkey I was and what a crummy position that person was in, I think I would think, gee, that's probably not good for me and it probably isn't good for her. But I think your observation suggests that indeed he was trying to force her to resign. And that's the essence of that meeting. You're forcing him to do anything just as a matter of flat-out straight fact. Maybe he's trying to force her not to bad-mouth the company and to be happier in her life. I think that's an excellent question for the jury to decide, Your Honor. Which was it? She doesn't admit she was bad-mouthing the company, by the way. So for purposes of summary judgment under Reeves, I think we are not to presume that that testimony offered by Mr. Gross is accurate. I thought she did admit that she had made some comments to some people about the company. I thought I read that somewhere in the record. Maybe I'm mistaken. I don't believe there's an admission by the plaintiff that – there may have been admission that she talked to others about it. Didn't she have her deposition taken? I'm sorry? Didn't she have her deposition taken? Yes. I thought it was in her deposition. Okay. Maybe I'm wrong. Yeah. And maybe I'm wrong. But I don't think it's determinative. The question is not simply did he have a reason to ask her whether she was happy or not. The question is, as distinguished from other cases where this Court has held there wasn't a constructive discharge, does he encourage her to resign? And the testimony in her affidavit is clear that he offers her the financial possibility of an arrangement. Were she to resign? In the context of a disciplinary meeting, which he himself describes as a third warning meeting. So three of the four factors that are commonly absent in cases where this Court has held there was no constructive discharge are present here. And this Court has made a distinction between a demotion and a pay cut, listing them as separate factors in the Schindrig case. By the way, it's an excerpt of Record 82 where your client, in her deposition, acknowledged that she criticized Gross to personal acquaintances. Well, criticized Gross versus bad-mouthing the company, I'm not here to mince words with you. That would be mincing words. Gross was the owner of the company and the president of the company. Yes. I mean, she wasn't bad-mouthing Gross because of this tennis game. Well, one can assume one – that's one reasonable inference, but I don't know that it's the only reasonable inference on summary judgment. And again, I don't – Don't fight the facts, counsel. I'm not trying to fight the facts. I'm trying to point out that I don't believe that particular fact is determinative, and I don't believe the only inference is that it's the equivalent to bad-mouthing the company. What is determinative is not simply that he wanted to have her resign. If that's so, if that's where his questioning and his warning went, she also has to show that the working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them, and the employee did leave the employment as a result of these working conditions. So it isn't all that he wanted her to leave. I totally agree. The question is the working conditions. I totally agree. Now, where is the triable issue of the fact that being shifted from a management to a sales position and making more money means the working conditions are intolerable to a reasonable person? The working conditions are the one-year-plus period of time where she is subjected to discriminatory and retaliatory comments, embarrassing treatment, belittling hostile meetings where she opposes the mistreatment of older workers, where she is forced to attend numerous such meetings that go on for hours, where she's demeaned to the point where she's shaking and crying as she leaves such meetings in front of others, as affidavit testimony establishes, that she felt humiliated by such conduct. What I couldn't figure out, and I might have missed some of the detail, is I understand she felt demeaned. She was demeaned. He wasn't agreeing with her. If I recall correctly, am I wrong? He never said to her, you're an O.P. and we're going to do things to you because of that. He didn't say that to her. Am I correct? I believe that's correct. So her feeling of being demeaned and such was that in these meetings he was more interested in what the young people had to say than what the older people had to say. And what else? What else did he say to demeanor? I just don't remember. The meetings are not – the nature of what is said in the meeting is – the details of what is said in the meetings is not fully developed in the record. It wasn't developed at all because some people feel demeaned simply because you don't agree with them. As a matter of fact, you see that it seems to be increasing in our society, I'm told. You're someplace and the person spits at you and you say, you spit at me. And they say, why are you talking nasty to me? You're demeaning me. You're a spitter. So demean is a funny word? Well, demean and belittle, humiliate, embarrass, those are all words used. And they are not just her words. Tell me something specific. Cut off in mid-sentence in front of others frequently. That happens in this court very often. I hope you don't feel demeaned. I suspect it was the manner in which it was done. I can assure you district judges often feel demeaned. There is testimony about being micromanaged, far beyond what other people are micromanaged, to the point of interfering with her job, to the point of making it difficult to do her job. That's testified to by Simpson as well as the general manager, Volz. There is testimony about being embarrassed in front of management and others by having it announced publicly that she would not get a raise because she was already being paid enough. Being publicly stated in front of others at management meetings that she'd no longer have input in hiring or firing decisions. Examples of being confident. Wait a minute. Salespeople don't have input. This is prior to her demotion, Your Honor, prior to her demotion. Testimony about her decisions being contramanded. Testimony that she singled out for a pattern of embarrassment. Not just her testimony, but made by observers, Volz, the general manager, who says that he is told to make a document and create a record so that she could be fired. He himself concludes that Mr. Gross is trying to get her to quit, as does Ms. Simpson. Ms. Simpson refers to the micromanagement and the level of it and the excessive supervision and the unjust criticism as making her, the plaintiff's life, miserable. It's not just words. It's specific conduct. It is over a period of one year. Unlike the Steiner case relied upon by both the district court and defendant, it doesn't cease two and a half months prior to the resignation. It continues up to the day of her resignation, and that's established on ER 78 that it goes up through the day of the resignation. It is not like the King case relied upon, where it is essentially just a demotion. Isolated from any retaliatory or discriminatory conduct. Counsel, when she moved to her other position, she was in her mid to late 40s. Is that right? 50s. Mid to late? Early 50s. Early 50s. Yes. Okay. And the person who replaced her was in his 40s? 39. 39. Having been identified previously by Mr. That was Mr. Kennedy. And he had previously been identified by Mr. Stevenson as the individual that Mr. Gross wanted to replace her with. And Mr. Gross had previously referred to him as a younger, more aggressive salesperson. I will reserve my two minutes at this time. Thank you. May it please the Court, Rick Van Cleef on behalf of GCC Bend. I think the Court, frankly, only needs to key on three factors. The first is that in February of 2001, Ms. Wood voluntarily signs a new employment agreement. She had previously entered into an employment agreement. They sign an addendum. She moves from the director of sales to the national sales manager. The key thing about that agreement, though, is, besides the fact that it's voluntary, and they never deny it's voluntary, it's not a gun to the head voluntary. She voluntarily signed it. She got more money, absolutely got more money. She testified that she knew she would continue to make more money under that agreement, and she got financial security that she'd never had before, severance pay. So she signed a new contract that paid her more money for less work, and it also provided for financial security that she didn't have in the previous position. That's factor one. Factor two is we're talking an awful lot about, or plaintiffs do, about constructive discharge. The fact is she quit, and she didn't quit because of constructive discharges. In fact, I don't know of any constructive discharge where somebody doesn't quit, otherwise you're fired. I agree with that, Your Honor. My point being, though, that she didn't quit because of these alleged intolerable conditions, which are, frankly, just a collection of petty personal slights and some paranoia by the plaintiff. But she quit because, and I quote from Supplemental Excerpt 46, I knew the budgets of the station. I know what the overhead was that we could not afford, or that the station could not afford the high incomes that were being brought on board, and that he was, again, had come to a point where he was going to have to let me go. Either he was going to fire me, which I truly believed he would not do, that he was just going to make things bad enough that I would eventually resign. So it doesn't have anything to do with the past. She quits by her own admission. And this is what she told the unemployment folks. She quit because she thought of what was going to happen in the future. So it's not looking at past intolerable conditions. It's what we're talking about is a fatalistic forecast of future events. Excuse me. The other point I think that you need to look at, and it relates to both Mr. Volz and I guess the plaintiff in some respect, in this record there's only evidence of one employee over 50 ever being terminated. That was the original general manager when the plaintiff was hired, Dan Volz. The record is absolutely clear by plaintiff's own admission, which you can find at Supplemental Excerpt 17, that the station was underperforming and had been underperforming the whole time Mr. Volz was there. In that regard, it bears noting, again by plaintiff's own admission, that when she was the director of sales, they never made budget, ever. Now, she whines in the record about that the budgets are unrealistic, and she comes up with a number of excuses why she believed that the overall sale budgets were unrealistic. But the fact is she never attained them. She moves to her new position where she's only responsible for her own sales, and she makes $3,500. Did they make budget? Pardon me? Did they make budget with the new director of sales? It depends on when you're talking about the new director of sales. She is originally replaced by Mr. Steveson, who's the new general manager. Volz is terminated. Steveson comes in. The record is clear in his affidavit that, as had been his practice at every radio station he'd worked at since 1984, that when he assumed the general manager position, he also assumed the director of sales position. Frankly, the station was no more profitable when Mr. Steveson took over, and he is there for a very short time and then packs up and heads back to Texas. At that point, John Gross, the president, comes in and assumes the general manager position, also initially assumes the director of sales position. And, frankly, Mr. Gross is not much better at being profitable than any of the predecessors. So the criticism of Ms. Wood that she never made budget can also be made of Mr. Volz, Mr. Steveson, and Mr. Gross. I agree. That's correct. That's correct. But the fact is, it is a ‑‑ but when she did move in her new position ‑‑ There can hardly be a reason for her demotion. I deny that it's a demotion. What happened was, again, the simple ‑‑ and it is not contested in the record that Steveson comes in, he takes the new position because that's what he does. He's general manager. It's his station to run. He takes the director of sales position. He moves her into national sales because he said, that's where I need you. Now, what I believe Mr. Hunt has mischaracterized the district court's finding about a discriminatory demotion, the only question of fact that the district court found with respect to this issue of whether it was a demotion was not the decision by Steveson to take her out, to put himself in that position and move her to another position. The question was, in the district court's mind, why she wasn't moved back into the, quote, unquote, open question on retaliation is why she wasn't moved back into the director of sales position after Steveson left and after Gross took over. It is true that eventually a new director of sales, Ms. Pizzotta, was hired. Excuse me. And she was younger than plaintiff by seven years, which is an issue of whether that's sufficient to be meaningful under precedent. But the fact is she quit. She quit not about because of what had happened in the past, but what she thought was going to happen in the future. And the best evidence, I think, of that, frankly, is her testimony is why she picked July 13th, which was the day she quit. What was the magic to July 13th? Well, the magic to July 13th was that's when her commission check was due. Your basic premise is that this company was something of a corporate Rubik's Cube as they were trying to move people around to try to find a mix that would make money. Is that right? That's correct. The radio, it's just a tough market. You know, you're in Bend. You've got a number of stations. It's all on sales. And so they're trying to find something that works. They went through a lot of different managers, and they're moving people around, and they're trying to do it. Did they ever make money? I suppose it depends on the corporate accounting. But they have never made the money they wanted to make, I can tell you that. Okay. Not that that has anything to do with this case one way or the other. But the other thing that's left unexplained on this record, frankly, is that plaintiff admits that John Gross, the alleged evildoer in this case, if there is one, frankly, hired her and enthusiastically supported her hiring. Yet they don't or can't explain how is it, based on those facts out of her own mouth, that somehow he takes on a year later, because she's 49 instead of 48, or 50 instead of 48, that somehow he views her age as an impediment. They also can't explain. Does that affect the burden of proof of the non-moving party that the same agent who hired the person is accused of later becoming discriminatory? I think we have some cases in the circuit saying that there's a different burden of proof when the same person who hires then fires. Are you acquainted with those cases? I am, and I think there is a heightened burden, as I understand this Court's precedent, I think that there is a heightened burden on the plaintiff to explain that if I hire a person, such as Ms. Wood, who's over 40, and I know she's over 40, she's in a protected class, and two years later I, the same person, make the decision to fire her, I think they have to explain what happened in the interim to make age a relevant factor. Look, I think the big issue here is, you know, I don't think your opposing counsel contends that today that he has all the marbles in his pocket. What he's saying basically is that these are genuine issues of material fact that should not have been susceptible to disposition in the manner in which it was. Why don't you address that? Why aren't there issues of fact as to whether or not she was constructively discharged because she was cut off in mid-sentence or told that she wasn't going to get a raise in front of other employees and all of these other things that allegedly occurred? My response there, Your Honor, would be that this Court has made a clear distinction because if we're going to go down this road, frankly, that every perceived subjective petty slight as being cut off in mid-sentence, which happens to me every evening when I go home, that that's somehow demeaning and that would give rise to a legal point. You're eliminating the possibility of summary judgment because now we're talking about what she viewed as demeaning and I view as maybe impolite or impolitic becomes a material fact. And I think this Court has made clear in Nesbitt and some of the other cases that we're not going to get into the business of parsing petty personal slights. The issue of – there is no issue of material fact. Regardless of what they want to spin this previous year, they can't get around her testimony that she quit because of what she thought was going to happen in the future. It had nothing to do – there's no testimony in there at all. What she thought was going to happen in the future with respect to budget, overhead, expenditures, and necessity to cut her job out, not what was going to happen in the future with respect to how she competed. Correct. Correct. It's clearly – and again, it's at page 17 of the supplement. It has everything to – I know budget, she says. And so she imagines – she comes up with a scenario. Well, they're paying Kennedy this and they're paying Pissatta that and they're paying me – now paying me $68,000 plus a year because of the bonuses, which she admitted that she continued to expect to earn in the future, that something's going to have to give and that the give is going to be me. But there's no basis for that in the record other than it's just her forecast. That's why she quits, pure and simple. So we don't have any allegations here of gender discrimination to my knowledge, do we? No gender. No gender. There's no – nothing of that. It's pure age. Pure age. And one of the other facts that I think is worth noting, if we're talking about pure age, and it's in the record that during her tenure as the director of sales, Ms. Wood hired a number of salespeople, every one of whom I believe, with maybe one exception, were over 40. At no point did John Groves, who was the president, have the ultimate authority, responsibility. At no point did he ever, A, criticize her for hiring people over 40, nor, more importantly, vetoing – excuse me – I thought she did. I thought she alleged – I thought there's some place in the record where she alleges – maybe we'll hear this from your opposing counsel – but she alleges that she was – because she hired older people, not considerably older, but somewhat older people, than I guess it was Mr. Groves hired. And she was claiming that he was on her for hiring people that were, like, out of touch with the demographics of the radio station or something of that kind. That's what he claims. I don't think the deposition testimony is that clear. But let's – I'll assume that for purposes of this argument in this record. So what? He had the absolute authority to say, don't hire that person, and did not. Does he have the authority to say, don't hire this person, they're too old? It happens every day. Well, I know it does. That's why we have federal law. I understand that, Your Honor. He does have the authority to say – he wouldn't have to say because they're too old. He could have just said, don't hire that person. He doesn't have to say because the facts is the same on the question of whether the person is hired or not. But he never, in fact, vetoes any hiring. And the only person who was ever terminated over the age of 50 was Dan Volz, who was the general manager who the station underperformed from the day he became general manager until the last day he was there. So there's hardly a – you know, if we're going to get down to the level of, well, he invited Brian Kennedy to go play golf, and he didn't invite the older employees. Well, there's no record – there's no evidence in the record that anybody else played golf other than Mr. Kennedy. Well, I don't think I've seen too many hosts on MTV over 60. So there's got to be something going on there, right? Remember, this is all radio. So, you know, these are all faces built for radio. And the question is, you know, is this an easy – if you're asking me whether this is an easy company to work for, I'd tell you no. I mean, they've got a lot of money invested in these stations, and the market hasn't turned out to be what they thought it would be. And so he quote, unquote, micromanaged them. It's his money. I mean, if he wants to set budgets, if he wants to look over his shoulder, it's his money. The station always underperformed. And unless there's any further questions. Thank you. Mr. Hunt. I need to get a couple things straight in the record. First of all, Mr. Gross did not hire his wood. The testimony of page ER-48 in Mr. Dan Volce's affidavit, paragraph 2, I hired Deb Wood on my own authority. So there is no question here of a presumption of – Well, did Mr. Gross own the station, though, at the time? Certainly. He could have probably overridden that, but it's on his own authority. Okay. So he certainly did not come in and say, whoa, this woman is 48, we can't hire a 48-year-old. Didn't say that. But there is evidence in the record that Jim Gross, who was supposed to manage the company, couldn't get there because of the divorce, and so there's this sense of a hurried decision made by Volce, not John Gross. So there is no presumption here. There is no increased burden on the plaintiff. Mr. Van Cleve would have the court believe that the sole reason a plaintiff quit was due to knowing that financially the company couldn't afford the new $80,000 salary for Ms. Pizzotti, as well as her own salary, as well as Mr. Kennedy's salary. All in the context of all this difficult, not-making-money, never-meeting-budget context that he creates. The importance of that is that, having been told three weeks earlier, I'm not firing you, she had every reason to believe that he would make the conditions worse, not better, not the same, but worse, to get her to quit. And the testimony, the facts, in her act of doing that. So this would lose money in greater amounts just to force Ms. Wood to quit? No, no, that's not my argument. My argument is that the significance of her younger replacement, Mr. Kennedy, being hired, and then when the director of sales position is opened up, she doesn't get that position back. It's hired by the labeled young, vivacious Ms. Pizzotti, that she knows, due to the budget situations that the defendant makes such an issue of, that the company can't afford all three salaries. And yet, she's been told she's not being fired. I think we've got you. You're running over your time. Okay, very good. If I may direct the court to E.R. 34 for the additional reasons, not just the financial reasons that cause her to quit. All right. Thank you. Thank you for a very well-argued case, both gentlemen. The case of Wood v. GCC Bend LLC is now submitted for decision.
judges: Fernandez, Bea, Ezra